## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————————

SIEMENS HEALTHCARE )
DIAGNOSTICS, INC., )
            )
            **Plaintiff,** )    **Civil No.**
            )    **10-40124-FDS**
            **v.** )
            )
ENZO LIFE SCIENCES, INC., )
            )
            **Defendant.** )
—————————————————————————)

## MEMORANDUM AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

      This is an appeal of a decision of the United States Patent and Trademark Office ("PTO")

Board of Patent Appeals and Interferences ("BPAI").  On August 7, 2006, the PTO declared an

interference between various claims of U.S. Patent 5,124,246 (currently owned by plaintiff

Siemens Healthcare Diagnostics, Inc.) and U.S. Patent Application No. 08/479,995 (filed by

defendant Enzo Life Sciences, Inc.).  It then determined that Enzo was the first to invent the

technology claimed by both parties, granting Enzo exclusive rights to a patent for that

technology and rendering Siemens's patent unenforceable.  Unhappy with the BPAI's decision,

Siemens sought review by this Court, which has subject-matter jurisdiction pursuant to 35

U.S.C. § 146 and 28 U.S.C. § 1331.

      The parties have cross-moved for summary judgment.  For the following reasons, Enzo's

motion for summary judgment of invalidity and to dismiss for lack of subject matter jurisdiction

will be denied, Siemens's motion for summary judgment of unpatentability will be denied, and

Siemens's motion for summary judgment under § 135(b)(1) will be granted in part and denied in

part.

## I.      Statutory and Factual Background

The technology at issue in this case is used for the detection of biologic compounds,

called analytes, in a sample such as a blood sample.  The technology can be used to determine if

an analyte is present in the sample (such as a virus).  The technology uses the property of nucleic

acid molecules to bind (or to hybridize) with one another to provide information about what is

present in the sample.  For example, the technology can be used to detect nucleic acid sequences

that are specific to a particular virus.  Thus, one application of the technology is to diagnose a

patient with a viral infection, such as HIV.  In addition to hybridization (binding) of nucleic acid

molecules, a detection signal is also needed in order to detect the analyte, and, thereby diagnose

or monitor the progression of a disease.  Thus, the technology provides a way to detect an

analyte in a biologic sample by means of the binding of the nucleic acid sequences and the

detection of the signal.

Both parties claim exclusive rights to a patent for this assay.  Before turning to the

procedural background of this case, a brief review of the relevant statutory scheme is warranted.

In the United States, only one patent is permitted for a given patentable invention.  When

two parties claim the same invention, the right to the patent turns on which party is the first to

invent, or has "priority of invention" over, the claimed subject matter.  This is frequently

determined in an interference proceeding before the BPAI.[1]

## A.      Interference Proceedings before the PTO

The Director of the PTO is authorized to declare an interference between different

---

[1] A patent owner may also initiate a priority-of-invention determination by filing suit in federal court against the owner of an allegedly interfering patent.  *See* 35 U.S.C. § 291.

patents and/or patent applications when they appear to claim the same invention.  35 U.S.C. §

135.  Once an interference is declared, § 135 provides the BPAI with jurisdiction to conduct a

proceeding to determine priority of invention.  Section 135(a) provides:

> Whenever an application is made for a patent which, in the opinion of the
> Director, would interfere with any pending application, or with any unexpired
> patent, an interference may be declared . . . . The [BPAI] shall determine
> questions of priority of the inventions and may determine questions of
> patentability.  Any final decision, if adverse to the claim of an applicant, shall
> constitute the final refusal by the [PTO] of the claims involved, and the Director
> may issue a patent to the applicant who is adjudged the prior inventor. . . .

35 U.S.C. § 135(a).  Under the statute, the BPAI also has the power to determine the validity (or

"patentability") of the invention.[2]  Once an interference is properly declared, a priority

determination is mandatory.  *See Guinn v. Kopf*, 96 F.3d 1419, 1421-22 (Fed. Cir. 1996).  A

patentability determination, if fairly raised and fully developed before the BPAI, is "nearly

mandatory."  *In re Gartside*, 203 F.3d 1305, 1317 (Fed. Cir. 2000); *see Perkins v. Kwon*, 886

F.2d 325, 328-29 (Fed. Cir. 1989) (interpreting the language "may determine questions of

patentability" to permit discretion only where patentability is not placed at issue); *see also*

*Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1334 (Fed. Cir.

2010) (citing *Perkins* for this proposition).  Furthermore, the Federal Circuit has held that the

BPAI should determine priority and patentability even after a party to the interference no longer

has a personal stake in the outcome.  *Gartside*, 203 F.3d at 1317; *Guinn*, 96 F.3d at 1420-21.[3]

---

[2] For a detailed discussion of the BPAI interference process, *see Human Genome Scis., Inc. v. Amgen, Inc.*, 552 F. Supp. 2d 466, 467 (D. Del. 2008).

[3] In *Guinn v. Kopf*, Guinn attempted to terminate a proceeding before the BPAI by filing a statutory disclaimer of all claims involved in the interference.  96 F.3d at 1420.  Because the disclaimer eliminated all of Guinn's interest in the disputed invention, he argued that no controversy existed between the parties and that the BPAI therefore lacked jurisdiction.  *Id.*  The BPAI disagreed, entering judgment against him.  Interpreting 35 U.S.C. § 135(a), the Federal Circuit affirmed, holding that the BPAI must decide issues of priority as long as jurisdiction was proper at the time the interference was declared.  *Id.* at 1421-22.  Thus, the existence of a "controversy" between

This continuing jurisdiction is based in part on the PTO's duty to resolve rights of concern to the

public:

> The [BPAI], by resolving both priority and patentability when these questions are
> fully presented, settles not only the rights between the parties but also rights of
> concern to the public.  The public interest in the benefits of a patent system is best
> met by procedures that resolve administratively questions affecting patent validity
> that arise before the PTO.  To do otherwise is contrary to the PTO's mission to
> grant presumptively valid patents, and thus disserves the public interest.

*Gartside*, 203 F.3d at 1318 (quoting *Perkins*, 886 F.2d at 328-29) (internal citations omitted);

*Guinn*, 96 F.3d at 1422 (same).

### B.      The Role of the Federal District Courts

Once the BPAI has rendered a final decision, an aggrieved party may seek review of that

decision in federal district court.  The statute provides in relevant part:

> Any party to an [interference] dissatisfied with the decision of the [BPAI] on the
> [interference], may have remedy by civil action . . . .  Such suit may be instituted
> against the party in interest as shown by the records of the [PTO] at the time of
> the decision complained of, but any party in interest may become a party to the
> action. . . .  Judgment of the court in favor of the right of an applicant to a patent
> shall authorize the Director to issue such patent on the filing in the [PTO] of a
> certified copy of the judgment and on compliance with the requirements of law.

35 U.S.C. § 146.  "District court review of an interference proceeding under § 146 is an

equitable remedy of long standing."  *General Instrument Corp. v. Scientific-Atlanta, Inc.*, 995

F.2d 209, 214 (Fed. Cir. 1993).  An action in district court pursuant to § 146 takes the form of a

"hybrid appeal/trial *de novo* proceeding in which the PTO record is admitted on motion of either

party, but it may be supplemented by further testimony."  *Human Genome Scis., Inc. v. Amgen,*

*Inc.*, 552 F. Supp. 2d 466, 468 (D. Del. 2008) (quoting *General Instrument*, 995 F.2d at 212).

----

interested parties was not a continuing requirement for jurisdiction under § 135(a).  The Federal Circuit affirmed and
expanded this logic in *In re Gartside*, 203 F.3d at 1317, where it held that the BPAI retained jurisdiction to decide
issues patentability as well as priority despite the absence of a "controversy."  *Id.*

Although it has some aspects of a trial, a § 146 action is not a new proceeding, but rather an appeal of the BPAI's interference determination.  "[T]he interference proceeding is a multi-part action with appeal as of right, starting in the PTO and culminating in court.  The civil action authorized by § 146 is not a new claim, but an authorized phase of the interference proceeding that is conducted by the PTO and is subject to judicial review."  *Vas-Cath, Inc. v. Curators of the Univ. of Mo.*, 473 F.3d 1376, 1382 (Fed. Cir. 2007); *Rexam Indus. Corp. v. Eastman Kodak Co.*, 182 F.3d 1366, 1370 (Fed. Cir. 1999) (A § 146 action is "derivative of the interference conducted in the PTO.").

Having reviewed the statutory scheme, the Court turns to the facts giving rise to the present action.

### C.  Procedural Background

On May 5, 1983, Enzo filed an application, U.S. Patent Application No. 06/491,929 ("the '929 application"), that claimed invention of the technology at issue.  (SMF §135 ¶ 11).  Over the next 12 years, Enzo filed an additional six applications directed toward the same technology.  (SMF §135 ¶ 12)  The last of these applications, U.S. Patent Application No. 08/479,995 ("the '995 application"), was filed on June 7, 1995.  All six applications claimed priority to the '929 application.  (Def. Resp. To SMF §135 ¶ 12).

On October 15, 1987, Bayer Healthcare, LLC filed an application, U.S. Patent Application No. 109,282, that both sides agree was directed toward the same technology as Enzo's patent applications.  (SMF §135 ¶ 8).  After four-and-a-half years of patent prosecution, the PTO issued to Bayer U.S. Patent No. 5,124,246 ("the '246 patent") on June 23, 1992.  (SMF §135 ¶ 8).

More than 14 years later, on August 7, 2006, the PTO declared an interference between the '246 Siemens patent and the '995 Enzo application.  (SMF §135 ¶ 8).[4]  At the time the interference was declared, the '246 Siemens patent was nearing the end of its 17-year statutory term, while Enzo's claimed invention had been pending in the application process for nearly 25 years.[5]

During the interference proceeding, the BPAI made a number of rulings that Siemens now challenges.  First, it declined to allow briefing on Siemens's challenges to the patentability of Enzo's claims, because it determined that doing so "would be a significant distraction from the priority determination."  (Compl., Ex. 5 at 3).  Second, it declined to allow briefing on an alleged multiple-dependency problem in some of Enzo's claims because "[r]esolving the problem is not necessary to determine priority."  (Compl., Ex. 5 at 3).  Third, it considered, and rejected, Siemens's contention that Enzo failed to comply with 35 U.S.C. 135(b)(1).  (Compl., Ex. 6 at 10).[6]  Fourth, it rejected Siemens's motion for a decision that no interference-in-fact existed, determining that it was contingent on Siemens's failed § 135(b)(1) motion.  (Compl., Ex. 6 at 10).  Finally, it considered, and rejected, Siemens's assertion that Enzo's claims were unenforceable under the doctrine of prosecution laches.  (Compl., Ex. 6 at 31; Def. Mot. Dismiss

[4] At the time of the interference, the '246 patent was owned by Bayer Healthcare, LLC; however, it has since been purchased by Siemens.  For ease of understanding, the Court will refer to the owner of the '246 patent as "Siemens."

[5] Siemens contends that Enzo intentionally delayed bringing its application to completion so that it could collect royalties from the entities (including Siemens) who now make extensive use of the technology.  (Compl. ¶¶ 20-22).  Whether this assertion has any merit is not relevant to the motions presently before the Court.

[6] Section 135(b)(1)  provides that "[a] claim which is the same as, or for the same or substantially the same subject matter as, a claim of an issued patent may not be made in any application unless such a claim is made prior to one year from the date on which the patent was granted."  It is "intended to be a statute of repose, limiting the time during which an interference may be declared so that the patentee might be more secure in his property right."  *Berman v. Housey*, 291 F.3d 1345, 1351 (Fed. Cir. 2002) (internal citations omitted).

at 3-4).

Siemens did not contest Enzo's earlier filing date.  (Compl., Ex. 7 at 2).  Consequently, after rejecting the above motions, the BPAI ruled on February 22, 2010, that Enzo's '995 application had priority of invention.  (Compl., Ex. 7 at 2).  Siemens filed a request for rehearing, which was denied on May 14, 2010.

On July 9, 2010, Siemens filed the present action pursuant to 35 U.S.C. § 146 seeking review of all of the BPAI's decisions that were adverse to it.  Enzo responded by filing a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  On May 5, 2011, the Court denied Enzo's motion to dismiss.

The '246 Siemens patent expired in June 2009, during the interference proceeding and before the present action was filed.  On October 10, 2010, the '995 Enzo application was published pursuant to Enzo's voluntary request for publication.

The parties have now filed cross-motions for summary judgment on three different grounds.  First, Siemens has moved for summary judgment on the ground that either 15 U.S.C. § 101 or the judicially-created ban on "non-statutory double-patenting" renders the '995 Enzo application unpatentable.  Second, Siemens has moved for summary judgment on the ground that 202 of Enzo's claims are barred by 35 U.S.C. §135(b) because they were first presented to the PTO more than one year after the '246 Siemens patent issued.  Third, Enzo has moved for summary judgment on the ground that the claims of the '246 Siemens patent are anticipated, and thus invalid.  Enzo has also moved to dismiss for lack of subject-matter jurisdiction.

## II.    <u>Standard of Review</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  In evaluating a summary judgment motion, the Court indulges all reasonable inferences in favor of the non-moving party.  *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

## III.   Enzo's Motion for Summary Judgment of Invalidity

Enzo has moved for summary judgment of invalidity and to dismiss for lack of subject-matter jurisdiction.  Enzo contends that because Siemens did not contest priority before the BPAI, the claims of the '246 patent are anticipated by Enzo's '145 patent application publication, and thus are invalid as a matter of law.  Enzo therefore asserts that there is no actual case or controversy before this Court, and the Court lacks subject-matter jurisdiction to hear this § 146 action.

8

A.   **Legal Framework**

Federal courts are courts of limited jurisdiction, "and the requirement of subject matter jurisdiction 'functions as a restriction on federal power.'" *Fafel v. Dipaola*, 399 F.3d 403, 410 (1st Cir. 2005) (quoting *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).  "The existence of subject matter jurisdiction 'is never presumed.'" *Fafel*, 399 F.3d at 410 (quoting *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir. 1998)).  If the court determines "at any time that it lacks subject matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

Federal jurisdiction is limited by the Constitution to "cases or controversies."  If a plaintiff lacks standing to sue, a district court has no subject-matter jurisdiction to decide the merits of the underlying case.  *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir. 1992). To establish standing, a plaintiff must show (1) an injury-in-fact that (2) is "fairly . . . trace[able] to the challenged action of the defendant," and (3) is "likely . . . to be redressed by a favorable decision" in court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted).  "An inquiry into standing must be based on the facts as they existed when the action was commenced."  *Ramirez v. Sanchez Ramos*, 438 F.3d 92, 97 (1st Cir. 2006).

B.   **Analysis**

Enzo contends that because Siemens does not contest the date of priority, its patent claims are necessarily invalid, and it therefore has no remaining legally-protected rights in those patent claims.  According to Enzo, Siemens therefore suffered no cognizable injury as a result of the BPAI's decision in the interference proceeding, and has no standing to challenge that decision.

Enzo's argument either misunderstands, or misrepresents, the interaction between the doctrine of standing and the procedure for challenging an issued patent. At the time this action was commenced, Siemens possessed an issued patent. By law, that patent was then, and is now, presumed valid. Although the patent had expired, it could still be enforced against acts of infringement that occurred during its statutory term. *See* Mem. & Order on Mot. to Dismiss (Dkt. 30 at 15-16); *see also In re Morgan*, 990 F.2d 1230, 1232 (Fed. Cir. 1993) ("[A] patent does have value beyond its expiration date . . . . [and] may be sued on after it expires."). If upheld in this action, the Board's determination that Enzo had priority of invention would have the effect of rendering Siemens's patent invalid, eliminating its ability to sue to protect any remaining patent rights. If this Court were to overturn the Board's determination, Siemens would retain the ability to enforce its patents against past acts of infringement. Thus, Siemens has clearly alleged an injury, reasonably traceable to Enzo's conduct, that would be redressable by a favorable decision in this Court.

Enzo attacks this injury as insufficient on the basis that Siemens's patent claims are invalid as anticipated by Enzo's published patent application. However, Enzo cannot point to any judicial determination establishing that the '246 patent is presently invalid, let alone that it was invalid at the commencement of this action. Nor has Siemens conceded the issue of invalidity.

Enzo does not cite to a single case in which a court has dismissed a § 146 action because the party in possession of a valid patent had no standing to contest the outcome of the Board's interference proceeding. Nor could it, as such a holding would be fundamentally at odds with the exhaustive procedures, set out by law, by which the Patent Board and the federal judiciary

determine the validity or invalidity of a patent.  As Siemens states in its brief, "[i]nvalidity 'in the air' is not part of our law.  Rather, an issued U.S. patent is presumed valid until proved invalid by clear and convincing evidence in infringement litigation . . . or by a preponderance of evidence in an interference.  *See Apotex*, 254 F.3d at 1037.  Neither has happened to the '246 patent."  (Pl. Opp. at 13).

At the present moment, the '246 Siemens patent remains a valid (albeit expired) patent. This Court has thus been presented with a § 146 action between a party with an issued patent and a party that challenges the validity of that patent.  There can be no question that the Court may properly exercise subject-matter jurisdiction over this action.

To the extent that Enzo's motion asks this Court to decide the issue of anticipation, the Court will decline to do so.  Enzo does not contest that it did not submit any briefing or argument on the issue of anticipation, or any similar issues of validity, during the course of the interference proceeding.  Thus, the issue was not before the BPAI during the interference.  As Enzo itself stated in an earlier memorandum to this Court,

> The Federal Circuit has limited the issues that may be considered in a Section 146 action to those that were raised in the underlying interference proceeding:
>
>> In order for an issue to have been raised adequately so that it qualifies for consideration in a § 146 proceeding, the issue should have been raised as specified in the PTO's interference rules, for example, through preliminary motions, motions to correct inventorship, miscellaneous motions, belated motions delayed for good cause, or opposition to these motions.
>
> *Conservolite, Inc. v. Widmayer*, 21 F.3d 1098, 1102 (Fed. Cir. 1994); *see In re Watts*, 354 F.3d 1362, 1367-68 (Fed. Cir. 2004) ("We have frequently declined to hear arguments that the applicant failed to present to the board.").

(Def. Mem. in Supp. of Mot. to Dismiss at 8).  Indeed, Enzo went on to state that "The Federal

Circuit has held that consideration of such issues not raised in the interference would be an abuse of discretion by the district court." *Id.* Thus, this Court will not now attempt to decide, for the first time, complex issues of anticipation and invalidity that were not before the BPAI.

Accordingly, Enzo's motion for summary judgment as to invalidity, and to dismiss for lack of subject-matter jurisdiction, will be denied.

## IV.    Siemens's Motion for Summary Judgment of Unpatentability

Siemens has moved for summary judgment on the ground that the claims set forth in Enzo's patent application are unpatentable, because allowing them would result in two patents on the same inventive concept. Siemens contends that such a result is contrary to law and would cause serious harm to the public.

The facts presented by this case are unusual; indeed, the parties have suggested that the case appears to be *sui generis*. Enzo first filed a patent application claiming the subject matter at issue in this suit more than 30 years ago, in May 1983. Since then, it has filed six subsequent applications, including the '995 application in 1995. The '995 patent application remains pending before the United States Patent and Trademark Office (the "PTO").

Meanwhile, Siemens first filed the application for its '246 patent in October 1987. That patent issued on June 23, 1992. It is uncontested that all of the claims in the '995 application are directed to subject matter that was also claimed by the '246 patent.

The interference proceeding between the '246 Siemens patent and the still-pending '995 Enzo application was declared more than 14 years into the life of the '246 patent, and the decision in that proceeding did not issue until nearly a year after the '246 patent expired. If upheld by this Court, the Board's decision will result in the cancellation of the already-expired

12

claims in the '246 patent, and the issuance of the '995 application as a valid patent.

Thus, this Court faces the unusual circumstance of having to determine whether a subject matter that has been patented for 17 years, and then free from patent protection for four years, may now be subjected to an additional 17 years of patent protection.

A.   **Legal Framework**

Patent law aims to balance the interests of inventors in the exclusive right to their inventions against the interests of the public in access to the inventions.  One of the most fundamental tenets of patent law is that a subject matter may be protected by patent for a limited period of time, after which it enters into the public domain, and may be used freely.

To secure this balance, the law seeks to ensure that a patent owner cannot unfairly extend the patent's monopoly, and to protect the public's expectation that "upon the expiration of the patent it will be free to use not only the invention claimed in the patent but also modifications or variants which would have been obvious to those of ordinary skill in the art at the time the invention was made . . . ."  *In re Zickendraht*, 319 F.2d 225, 243 (C.C.P.A. 1963).  It does so both through statutes and through judicially-created doctrine.  By statute,

> [w]hoever invents or discovers any new or useful process, machine, manufacture, or composition of matter, or any new or useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title.

35 U.S.C. § 101.  Courts have routinely interpreted § 101 as precluding the issuance of more than one patent on the same invention.  *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 (Fed. Cir. 2003).

The judicially-created doctrine of "nonstatutory double patenting"—also known as "obviousness double patenting"—extends this preclusion to prevent patents from issuing on

13

claims that are "nearly identical to claims in an earlier patent." *Id.* at 1377-78.  Together, these

two prohibitions prevent a patentee from "obtaining an extension of the right to exclude through

claims in a later patent that are not patentably distinct from claims in a *commonly owned* earlier

patent." *Eli Lilly & Co. v. Barr Labs.*, 251 F.3d 955, 967 (Fed Cir. 2001) (emphasis added).

As is made clear by the italicized text above, both § 101 and the doctrine of nonstatutory

double patenting have traditionally been invoked when a single party seeks successive patents on

identical or nearly identical inventions.  Indeed, despite language in a handful of nineteenth-

century cases that suggests the restriction might apply to inventions made by different inventors,

this Court has not found a single case in which either §101 or the judicial doctrine of double

patenting has ever been invoked in an instance where two separate parties seek a patent covering

essentially the same subject matter.

Instead, the law provides other procedures to adjudicate competing claims to the same

patentable subject matter.  In the event that two patent applications—or a patent application and

an already-issued patent—are determined to cover the same subject matter, 35 U.S.C. §135(a)

provides for an interference proceeding before the Board of Patent Appeals and Interferences.

The interference proceeding is intended to determine which inventor is entitled to the patent.  As

further set forth by statute, either party to the interference proceeding may challenge the Board's

decision in federal court.  35 U.S.C. § 146.

The law also acknowledges that in some instances—and despite the fundamental

proscription on two patents covering the same subject matter—two issued patents may at times

claim the same invention.  In such a scenario, 35 U.S.C. § 291 provides for review by a federal

court.  That court is tasked with determining which patent should remain in effect, and which

should be invalidated.

B.      **Patentability of Enzo's Claims**

This case is a dispute between the owner of an issued patent and the owner of a patent application that appears to claim the same invention.  It is currently before this Court on review from a proceeding under § 135(a), as provided for in § 146.  Thus, it appears to fit squarely into the review scheme that Congress set out by statute to govern conflicts between two or more separate inventors.

Nevertheless, Siemens asks this Court to apply the statutory bar set forth in § 101, or the judicial bar on double-patenting, in order to find that the claims in Enzo's '995 application are unpatentable.  Siemens does not dispute that no court has ever before held that either rule applies in the context of a patent dispute between two separate parties.  Rather, it contends that the unique circumstances of this case justify an expansion of the application of the doctrines, and asks this Court to employ its equitable powers to deny Enzo's patent application.

Siemens's argument is based in large part on the fact that its '246 patent survived its entire 17-year term, and expired more than four years ago.  Siemens suggests that to allow a new patent to issue on the same subject matter would be contrary to the constitutional purpose of the patent system—to promote science and the useful arts.  As Siemens states in its brief, "[i]t plainly does not promote science and the useful arts to have double monopolies on the same subject matter.  If one does not know when the freedom from possible infringement suit exists, one will not invest time or money."  (Pl. Br. at 3).

Siemens also highlights the danger that such a result could cause harm to the public, which has a reasonable expectation that the technology set forth in an expired patent may now be

freely used.  Siemens contends that "[t]he public had every reason and right to expect that its

ability to use the '246 technology would be unhindered starting in 2009 when Siemens' patent

naturally expired upon conclusion of its 17-year term."  (Pl. Br. at 4).  It should not "have to be

on its guard that it might need to seek permission to use the '246 subject matter . . . from an

unknown party [] with an exclusive right . . . to the same inventive concept . . . ."  (Pl. Br. at 5).

Siemens has presented a series of well-reasoned arguments in opposition to the issuance

of a new patent to the '246 subject matter.  The circumstances of this case are unquestionably

unusual.  However, this Court is not in a position to create a new rule, or expand existing

precedent, to provide relief.  Indeed, the situation this Court confronts appears to be different in

degree, but not in kind, from that presented in any case involving an interference proceeding that

results in the revocation of an issued patent and the issuance of another patent application for the

same claimed subject matter.  Any case in which a previously-issued patent is revoked and a new

patent is issued in its place will result in an extension of patent coverage.  As Enzo notes, the

interference process has at times resulted in extensions of patent coverage of at least twelve

years.  *See, e.g., MedImmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 961 (Fed. Cir. 2005), *rev'd

on other grounds*, 549 U.S. 118 (2007).  Such extensions inevitably delay the public's ability to

make free use of the claimed subject matter, and thus in some way harm the public interest.

Siemens correctly highlights that this case differs from the standard interference

proceeding because the '246 patent expired during the course of the interference.  Thus, it

remained valid for its full 17-year term, and the public has benefitted from free use of the

technology for several years.  Should Enzo's patent ultimately issue, it is indeed possible that it

would cause harm to members of the public who have reasonably relied on the expiration of

16

Siemens's patent as allowing free use of the technology.

Siemens's argument is certainly not without force.  Nonetheless, it is not for this Court to determine the best mechanism for balancing the dual goals of patent law under these circumstances.  The procedure for instituting an interference proceeding set forth in 35 U.S.C. § 135 is the mechanism, chosen by Congress and enacted into law, for determining whether the owner of an issued patent or the owner of a pending application is the rightful owner of the patent.  The statute does not include any exemption for circumstances in which the initial patent expires prior to the termination of the interference proceeding.  There is no basis for deciding that this determination is not squarely covered by the procedure set forth in § 135.

Where a patent applicant properly invokes the procedures to institute an interference proceeding, that procedure governs the determination of which owner is entitled to a patent, and will result in one valid patent.  It is possible that, in the course of reviewing the record before it, this Court will determine that Enzo is not entitled to patent protection for any number of reasons that are properly considered in the course of judicial review of an interference proceeding under 35 U.S.C. § 135.  It is also possible that the Court will determine that the Patent Board properly determined that Enzo has priority of invention over the claimed subject matter, and that Siemens's patent was invalid.  Whichever conclusion the Court reaches, however, will be governed by the procedure explicitly set forth by statute.  There is a statutorily-specified procedure for addressing this issue, and this Court will not usurp Congress's role in determining how best to balance the dual goals of patent law by expanding the application of either §101 or non-statutory double-patenting.

Accordingly, Siemens's motion for summary judgment as to unpatentability will be

denied.

## IV.   Siemens's Motion for Summary Judgment under 35 U.S.C § 135(b)

Siemens has also moved for summary judgment on the ground that 202 of Enzo's claims are barred by 35 U.S.C. §135(b) because they were presented to the PTO more than one year after the '246 Siemens patent issued.[7]   As noted, the '246 patent issued on June 23, 1992; the critical date is therefore June 23, 1993.  Siemens contends that the claims are barred under § 135(b) because of three separate material claim limitations that Enzo added for the first time after the critical date of June 23, 1993.

It is undisputed that the 202 claims in Enzo's '995 application at issue in this motion were presented to the PTO after June 23, 1993.  However, Enzo contends that it was not barred from proceeding with an interference action on those claims because they were supported by prior claims that were timely filed.

### A.   Legal Framework

As set forth in 35 U.S.C. § 135(b)(1), "a claim which is the same as, or for the same or substantially the same subject matter as, a claim of an issued patent may not be made in any application unless such a claim is made prior to one year from the date on which the patent was granted."[8]  This provision is a statute of repose, "intended to limit the patentee's vulnerability to

---

[7] Enzo's '995 application contains 210 potentially-allowable terms; claims 507, 508, 510, 511, and 528-31 are not subject to the motion for summary judgment under 35 U.S.C. §135.

[8] Although the briefing on this issue—and this opinion—refer to §135(b)(1), the statute has been amended since the interference proceeding at issue in this case was instituted.  The currently enacted statute is even stricter as to the timing for instituting an interference proceeding.  Rather than requiring that all potentially-interfering claims be included in a patent application within one year of the grant of a patent, the newly-enacted § 135(a)(2) requires that the petition for an interference proceeding *itself* be filed within a year of the grant of the patent.  While the Court notes that Enzo's interference petition would clearly be time-barred under the current statute, this action is governed by the terms of the statute in force at the time the interference was declared in 2003.  Accordingly, for the sake of clarity, the Court will refer to §135(b)(1); in doing so, it references the prior version of the law that governed until

a declaration of an interference by limiting the window of time in which the cause of the

interference can occur." *Adair v. Carter*, 668 F.3d 1334, 1338 (Fed. Cir. 2012), citing *Regents of*

*Univ. of California v. Univ. of Iowa Research Found.*, 455 F.3d 1371, 1376 (Fed Cir. 2006)

(internal quotations omitted).  It requires an applicant who wishes to provoke an interference

proceeding with an issued patent to file a claim covering the subject matter at issue in the patent

no later than one year from the issue date of the patent.  *In re Berger*, 279 F.3d 975, 981 (Fed.

Cir. 2002).

The one-year time limit in § 135(b)(1) is subject to a narrow exception, where "the copier

had already been claiming substantially the same invention as the patentee during the critical

time period." *Adair v. Carter*, 668 F.3d 1334, 1337 (Fed. Cir. 2012) (quoting *Corbett v.*

*Chisholm*, 568 F.2d 759, 765 (C.C.P.A. 1977)) (internal quotations omitted).  Thus, a claim filed

after the one-year critical date may be entitled to an earlier effective filing date if the party filing

the claim can show that it had filed claims directed to the same subject matter before the critical

date, and that no "material differences" exist between post- and pre-critical date claims.  *Id*.

Under such circumstances, the later-filed claim will not be barred by § 135(b)(1).

In order for a post-critical date claim to be properly allowed under § 135(b)(1), the Patent

Board must determine that "all material limitations of the . . . claim necessarily occur in the prior

claims." *In re Berger*, 279 F.3d 975, 982 (Fed. Cir. 2002) (citing *Corbett*, 568 F.2d at 766.  It is

not sufficient for a limitation to be "inherently disclosed." *Parks v. Fine*, 773 F.2d 1577, 1580

(Fed. Cir. 1985).  Only if all material limitations of the later-filed claim "are present in, or

necessarily result from" the limitations of the earlier-filed claims, will post-critical date claims

---

recently.

be treated as timely filed.  *In re Berger*, 279 F.3d at 982.

When an applicant adds limitations in response to an examiner's rejection, and the amendment results in allowance, "there exists a well-established presumption that those limitations are necessary to patentability and thus material."  *Adair*, 668 F.3d at 1339.  Indeed, "[t]he insertion of [a] limitation to overcome the examiner's rejection is strong, if not conclusive, evidence of materiality."  *Parks*, 773 F.2d 1577, 1579 (Fed. Cir. 1985).

### B.  The Board's Decision

The Board began its analysis of Siemens's motion under § 135(b) by acknowledging that it was a "threshold motion, since the granting of [both it and a separate motion by Siemens] would deprive Enzo of 'standing in the interference.'" (Pl. MSJ on §135, Ex. 10 at 3).  The Board then stated that "[s]ince the concern of a threshold motion is whether an opponent may contest priority in an interference, survival of a single involved claim may be sufficient to permit the interference to proceed."  (Pl. MSJ on §135, Ex. 10 at 3).

The Board characterized the issue before it as "whether [Siemens] has shown that each contested limitation added after the critical date is material."  (Pl. MSJ on §135, Ex. 10 at 4).  It stated that any amendment gives rise to a presumption of material difference, but that the presumption may be rebutted with evidence.  (Pl. MSJ on §135, Ex. 10 at 4-5).

The Board proceeded to analyze "limitation 2," which applies to 43 of the claims in the '995 application.  The Board compared post-critical date claim 360 with pre-critical date claims 194, 237, and 239 in order to determine whether the added language in claim 360 specifying "*more than one non-radioactive signalling entity*" was a material new limitation.  It credited Siemens with having demonstrated that the amendment was "presumptively material," which

20

shifted the burden of disproving materiality to Enzo.

The Board's analysis began with the general proposition that claims are to be construed broadly.  It then focused on a comparison between pre-critical date claim 238—which expressly indicated that the "signal generating moiety comprises a radioactive moiety"—and pre-critical date claim 239, which stated that "the signal generation portion is selected from the group consisting of a fluorogenic compound, a phosphorescent compound, a chromogenic compound, a chemiluminescent compound and an electron dense compound."  (Pl. MSJ on §135, Ex. 10 at 9-10).  Enzo contended that the difference between the two claims demonstrated that compounds under claim 239 were intended to be non-radioactive.  The Board stated that "[n]othing in claim 239 prevents the listed compounds from being radioactive"; nonetheless, it determined that "it is more likely than not those in the art would have understood that such compounds would not ordinarily be radioactive."  (Pl. MSJ on §135, Ex. 10 at 10).  The Board went on to indicate that "[a]lthough claim differentiation is generally weak evidence for claim scope, it is evidence in support of Enzo's position."  (Pl. MSJ on §135, Ex. 10 at 10).

Ultimately, the Board determined that "[g]iven their juxtaposition, these claims provide evidence that one skilled in the art would have understood the claim 239 to include more than one non-radioactive signaling portion in distinction to scope of claim 238.  Claim 360 is not materially different from claim 239."  (Pl. MSJ on §135, Ex. 10 at 3).  The Board held that Siemens had not demonstrated that claim 360 was barred under § 135(b).  It did not proceed with any further analysis of the remaining claims and limitations.  Stating that "a single claim is sufficient to avoid a loss of standing," it denied Siemens's § 135(b) motion as to all claims.

Siemens contests the Board's decision on three grounds.  First, it contends that the Board

did not have discretion to decide the § 135(b) motion with respect to only some, and not all, of the contested claims.  Second, it contends that the Board erred in finding that the claims subject to limitation 2 were not materially different from the pre-critical date claims.  Third, it appears implicitly to challenge the Board's analysis concerning the burden of proof; Siemens contends that the burden rests with Enzo to show that its post-critical date claims are not materially different from its pre-critical date claims.

### C.   Standard of Review

A district court's review of an interference proceeding before the Patent Board is "a hybrid of an appeal and a trial *de novo*."  *Winner Int'l Royalt Corp. v. Wang*, 202 F.3d 1340, 1345 (Fed. Cir. 2000).  The Board's conclusions of law—including issues of statutory interpretation—are renewed *de novo*.  *Adair*, 668 F.3d at 1336.  The Board's factual findings are reviewed for substantial evidence, unless unsupported by the record.  *In re Berger,* 279 F.3d at 980.  If the court receives new evidence or live testimony, it must make factual findings on those issues *de novo*.  *See Brand v. Miller*, 487 F.3d 862 (Fed. Cir. 2007).

### D.   Section 135 as "Threshold" Determination

A determination that the claims involved in an interference are not barred by § 135(b) is "a threshold issue in an interference."  *Berman v. Housey*, 291 F.3d 1345, 1352 (Fed. Cir. 2002). It is to be addressed at a preliminary stage of the proceeding, prior to determining any issues of priority and patentability.  *See id.*

Siemens's "Motion 1" before the Patent Board contended that 202 of the claims at issue in the interference proceeding were barred by § 135(b).  The Board reviewed that motion as a threshold issue, and determined that because claim 360 of the post-critical date application was

not barred under § 135(b), the interference proceeding could properly continue.  Siemens contends that the Board should have addressed its contentions under § 135(b) with respect to all 202 contested claims, and asks this Court to find that the Board's interpretation of § 135(b) constituted legal error.

The Board correctly noted that a finding that *all* of Enzo's claims were barred by Section 135(b) would have been determinative.  The Court does not believe, however, that a finding that *one* of Enzo's claims does not violate § 135 is sufficient to allow all contested claims to remain in the interference proceeding.

Section 135(b) directs itself to "a claim" that is made after the post-critical date.  35 U.S.C. § 135(b).  Accordingly, the Federal Circuit has consistently held that to overcome a § 135(b) bar, "an applicant must show that *such claim* is not materially different from a pre-critical claim . . . ."  *Adair*, 668 F.3d 1334 (Fed. Cir. 2012).  While this Court has been unable to locate any cases in which this precise issue has been raised, the language of both the statute and the Federal Circuit's enunciation of the proper analysis strongly suggest that the § 135 analysis is a threshold determination that must be made for each claim separately.

Indeed, a contrary interpretation would frustrate the purpose of the statute.  Section 135 is intended to protect the expectations of the owner of an issued patent.  The limitations period set forth in § 135(b), taken together with the limited exception for post-critical date claims that are not materially different from pre-critical date claims, ensures that an interference proceeding can only be provoked based on claims that are disclosed in patent applications filed within one year of the patent's issuance.  Thus, for a claim filed after the critical date to be the proper basis of an interference proceeding, there must be no material differences between *that claim* and the pre-

critical date claims.

The Board appears to characterize the threshold determination required under § 135 as an on-off switch:  either a party may properly provoke an interference proceeding, or it may not. That characterization would not require any claim-by-claim determination of the content of that proceeding.  Rather, the Board's decision suggests that, so long as a patent applicant may properly provoke an interference proceeding based on a *single* post-critical date claim, *all* post-critical date claims may properly be considered in that proceeding.

If the Board's interpretation of § 135(b) were correct, a patent applicant could provoke an interference proceeding involving any number of post-critical date claims, as long as the applicant could prove that at least one of those claims was not materially different from the pre-critical date claims.  Thus, a pending application that covered only a small portion of the subject matter claimed in a patent could, based on post-critical date amendments, provoke an interference proceeding challenging the entire patented subject matter.

Such a system would eviscerate the statute's protections.  This Court reads § 135 as governing not only the circumstances in which an interference proceeding may be provoked, but also the scope of the claims properly considered in such an interference proceeding.  In order for a post-critical date claim to be considered during an interference proceeding, the Patent Board must determine that all material limitations of *that claim* necessarily occur in the prior claims. *See In re Berger*, 279 F.3d 975, 982 (Fed. Cir. 2002).  The § 135 threshold determination must be made as to each late-filed claim; it is not sufficient to determine that some other post-critical date claim could properly be considered in the interference proceeding

Thus, the Patent Board committed legal error when it failed to evaluate Siemens's §

135(b) motion with respect to 159 of the claims at issue.

      **D.**      **Patent Board's Evaluation of Limitation 2**

In addition, it appears that the Patent Board erred in its analysis of whether the added language in the post-critical date claim that it considered was a material new limitation over pre-critical date claims.

Due to the large number of claims involved in the interference proceeding, argument before the Board was presented in terms of six limitations that Siemens alleged first appeared in the involved claims after the critical date of June 23, 1993. The Board limited its analysis to one of those contested limitations, "more than one non-radioactive signaling entity," which the parties referred to as "limitation 2." It further limited its analysis to a comparison between post-critical date claim 360, which it accepted as representative of the claims containing limitation 2, and pre-critical date claims 194, 237, and 239.

Claim 360 defines an article of manufacture that includes a molecular bridging entity and two or more non-radioactive signaling entities, each capable of providing a detectable signal. The Board indicated that the requirement that the signaling entities be "non-radioactive" was added in an amendment to Enzo's patent application. In remarks accompanying the amendment, Enzo stated that a number of claims had

> been amended to recite *non-radioactive* signalling entities. It is believed that the new claim language, which has been incorporated into all of the previously rejected independent claims, negates the issue of novelty posed by Dunn's 1977 *Cell* paper (as well as their 1978 *Cell* publication).

(Pl. SMJ on § 135, Ex. 10 at 5). The Board found that the amendment was thus "presumptively material," and that Enzo had the burden of demonstrating immateriality.

The Board then undertook a lengthy analysis of the differences between the pre-critical

date and post-critical date claims.  Ultimately, it determined that although "[n]othing in claim 239 prevents the listed compounds from being radioactive . . . it is more likely than not those in the art would have understood that such compounds would not ordinarily be radioactive."  The Board acknowledged that claim differentiation is "generally weak evidence for claim scope," but nonetheless found it sufficient to satisfy Enzo's burden of demonstrating that claim 360 was not materially different from the pre-critical date claim 239.

As a preliminary matter, it is not clear to this Court that there is substantial evidence in the record to support the Board's finding that a person of ordinary skill in the art would have understood that the compounds claimed in claim 239 would not ordinarily be radioactive.  The Board's decision does not cite to anything, other than the wording of the claims themselves, to support this proposition.  It further acknowledges that the claim differentiation analysis it relied upon was "generally weak evidence for claim scope."  If the Board also relied on expert testimony or some other evidentiary basis for its factual determination, that reliance is not explicitly set forth in the opinion.  Thus, the question of whether there is substantial evidence in the record to uphold the Board's factual determination is a close one, at best.

Further, it is not clear how the Board determined, based on this evidence, that Enzo had met its burden of proving that there were no material differences between the pre- and post-critical date claims.  As Enzo and the Board both acknowledge, the "non-radioactive" limitation was added during an amendment to the application.  In the accompanying language, Enzo referred to the limitation as "new claim language . . . incorporated into *all of the previously rejected independent claims*" and indicated that it was intended to negate an issue of novelty. (Page 5) (emphasis added).  It is well-established that limitations added in response to an

26

examiner's rejection that result in allowance give rise to a presumption that those limitations are necessary to patentability and thus material." *Adair*, 668 F.3d at 1339.  Indeed, "[t]he insertion of [a] limitation to overcome the examiner's rejection is strong, if not conclusive, evidence of materiality." *Parks v. Fine*, 773 F.2d 1577, 1579 (Fed. Cir. 1985).  The Board correctly acknowledged that Enzo bore the burden to rebut this presumption.  It then went on to find that Enzo had met this burden, relying solely on the "weak evidence" of claim differentiation.  Given the "strong" evidence of materiality before the Board, it is by no means clear that Enzo actually presented sufficient evidence to meet its burden of rebutting the presumption of materiality.

However, even if this Court accepts the Board's factual determinations as true, those determinations do not appear to support the legal conclusion that the post-critical date claim at issue was not materially different from the pre-critical date claims.  As the Federal Circuit has made clear, a post-critical date claim may only be treated as timely-filed if all material limitations of the claim *necessarily result* from the limitations of the earlier-filed claims.  *See Parks*, 773 F.2d at 1580.  Here, the Board explicitly found that "[n]othing in claim 239 [the pre-critical date claim] prevents the listed compounds from being radioactive."  Furthermore, the Board did not determine that a person of ordinary skill in the art would have understood that such compounds would *necessarily* be non-radioactive; rather, it simply determined that such a person would have understood that the compounds "would not ordinarily be radioactive."  In other words, the Board's own factual determination indicates that the claims made before the critical date do not necessarily result in non-radioactive compounds.  Thus, there was no legal basis for the Board's conclusion that the pre- and post- critical date claims were not materially different.

Accordingly, this Court will reverse the Board's determination on Siemens's motion under § 135(b), and will remand the matter to the Board for further consideration consistent with this opinion.

**VI.**    **Conclusion**

For the foregoing reasons, Enzo's motion for summary judgment of invalidity and to dismiss for lack of subject-matter jurisdiction is DENIED.  Siemens's motion for summary judgment of unpatentability is DENIED.  Siemens's motion for summary judgment under § 135(b)(1) is GRANTED insofar as it argues that the Board of Patent Appeals and Interferences committed legal error when it failed to evaluate Siemens's § 135(b) motion with respect to 159 of the claims at issue and GRANTED insofar as it argues that the Board committed legal error in its conclusion that the limitation "more than one non-radioactive signaling entity" necessarily resulted from the limitations of the earlier-filed claims.  Siemens's motion for summary judgment under § 135(b)(1) is DENIED insofar as it asks this Court to determine in the first instance whether Enzo's claims are barred under § 135(b)(1).  The matter is remanded to the Board of Patent Appeals and Interferences for further proceedings consistent with this opinion.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV

Dated: August 14, 2013                              United States District Judge